## A93A1897. THE STATE v. ESPINOZA.
### (442 SE2d 911)

BEASLEY, Presiding Judge.

*Lorenzo* Espinoza was indicted for possession with intent to distribute marijuana, OCGA § 16-13-30 (j) (1). The State appeals the grant of his motion to suppress, OCGA § 5-7-1 (4). It contends that the seizure was within the "common area" curtilage. The case begins at Atlanta Hartsfield International Airport and involves two brothers.

Officer Webster, assigned to the Drug Enforcement Administration (DEA) at the airport, received information from an informant that on November 5, 1991, *Alejandro* Espinoza would be flying on a certain flight on a one-way cash ticket from Atlanta to Houston. The informant provided a physical description. Webster checked the airline's passenger name record and confirmed that Alejandro had checked in and had purchased his ticket with cash at the counter just 45 minutes prior to the flight's scheduled departure. About ten minutes before departure, Webster and DEA Agent Harvey observed him exit a lounge directly across from the gate. Webster approached, identified himself as a police officer, and asked to speak with him. Alejandro agreed to do so and permitted Webster to inspect his airline ticket, which bore the name "Alex Espinoza." He also provided a

Georgia driver's license with his name on it.

Webster then advised that he was a narcotics agent whose duty it was to deter narcotics traffic through the airport. He asked to search Alejandro's travel bag, to which he consented. Inside, Webster found a package, gift-wrapped with "diamond" paper, on top of what appeared to Webster to be two to three days' worth of clothing.

Webster inquired if the trip to Houston was for business or pleasure and Alejandro replied that he was going to visit his father in the hospital. He told Webster that his father was "going in for a kidney transplant and if that didn't work, he was going to have by-pass surgery." That struck Webster as peculiar. So did the fact that Alejandro stated he would be in Houston for a week, as it appeared there were not enough clothes in the bag for a week. Alejandro told Webster he did not have any checked luggage.

When Webster looked at the gift-wrapped package he noticed a card which read, "To: Jennifer, From: Kathy." Webster asked Alejandro if the package belonged to him. He replied that it did not, that he had gotten it from a friend and intended to deliver it to a person in Houston. He stated he "got it from Jennifer to Kathy" and said it contained steak knives. He refused to let the officers open it. Webster lifted the package and was convinced it did not contain steak knives. Alejandro gave permission for the package to be X-rayed, which disclosed "four rectangular type objects." He then agreed to placement of the package in a line-up for a dog to test and was told the package would be detained but he was free to go.

He elected to stay and watch the line-up. The dog "alerted to the package" and tore its corner, exposing United States currency. Alejandro continued to deny any knowledge of the contents of the package and initially denied wrapping it. After being confronted with two store receipts dated that day for gift wrapping and tape, he admitted wrapping it. Webster obtained a search warrant authorizing a search of the package, and $38,300 was found inside.

During Alejandro's interview, he gave his address as 251-B Dickson Road, Marietta, Georgia, but a boat registration he had on his person listed his address as 251-A. He related that he had a brother, Lorenzo Espinoza, who lived in Brownsville, Texas. The National Drug Information Computer showed that such a named individual had previously negotiated 2,000 pounds of marijuana.

Agent Harvey, who was present during the interview, called the Marietta/Cobb/Smyrna Narcotics Unit (MCS) and related to them a "summary of the entire events of that evening, including the interview of Alejandro Espinoza." Harvey advised those at MCS to drive by and verify the address, which they did.

Based on the information provided to MCS, a search warrant was issued for "251-B Dickson Rd., Marietta, Cobb Co., Ga., and any

outside buildings or vehicles present," for tangible evidence comprised of "unused alternating light blue diamonds and pink diamonds wrapping paper, U. S. currency, notes or drug records and any controlled substance as fruits of the crime."

The property manager of the duplex admitted the officers into both 251-B, leased to Alejandro, and 251-A, leased to appellant, his brother Lorenzo. The search of 251-B disclosed wrapping paper, notes, and store receipts for the wrapping paper. The officers also found some marijuana seeds (location unknown or not remembered). After the search of both residences, an agent discovered approximately five pounds of marijuana in a garbage bag outside near the driveway. The State concedes that whatever evidence was found inside 251-A, Lorenzo's unit, is properly suppressed as the fruit of an illegal search. The question is the legality of the search which produced the marijuana found beside the driveway.

One forked driveway served the duplex; after entry from Dickson Road it split to partially encircle the duplex. The location of the marijuana was described variously as "along side the driveway in some bushes"; "midway down the driveway, off to the — as you're facing the driveway, it was off to the left hand side in some bushes"; "just around this curve area right here . . . right in the woods. I'd say seven to eight feet off of the driveway"; 25-30 yards from the house. Facing the front of the structure, it was found on the left side of the driveway; unit 251-A is on the left side of the building.

The trial court found that Alejandro lived in unit 251-B, for which a search warrant was issued based on the seizure of $38,300 in U. S. currency (among other things) from him at the Atlanta Airport; that there was no search warrant or permission to enter 251-A; and that approximately five pounds of marijuana was "found on the grounds of 251-A and/or 251-B."

The court concluded that law enforcement officers had no legal right to enter the premises of 251-A and that the alleged illegal drugs were found within the curtilage of 251-A. It noted that "[t]he alleged illegal drugs may also be found to be in the curtilage of 251-B but this issue is not before the court." The court suppressed all evidence found in 251-A or its curtilage, including the five pounds of marijuana.

The first inquiry is whether or not the search warrant issued for 251-B was based on probable cause.

An MCS officer who had received the information related by Agent Harvey applied for the warrant. His affidavit by itself apprised the issuing magistrate that the resident of the premises sought to be searched, Alejandro Espinoza, had been found at the airport in possession of a package, which he had wrapped himself a short time before with paper freshly purchased, containing a large amount of

currency, that Alejandro was headed to a drug source city, and that those activities were typical of a drug courier. The magistrate also knew that an independent search warrant for the package itself (the validity of which has not been challenged) had already been executed.

In addition, "[n]ot only what is stated in the affidavit for the warrant but also the totality of the sworn circumstances before the magistrate may be considered in establishing probable cause. [Cits.]" *Brown v. State*, 151 Ga. App. 830, 831 (261 SE2d 717) (1979). The MCS officer also verbally informed the magistrate that the seized package had contained approximately $40,000 and that he had known marijuana traffickers do exactly what was done here, i.e., transport money by packaging it as a gift.

The search warrant for unit 251-B was based on ample probable cause. Compare *State v. Porter*, 167 Ga. App. 293 (306 SE2d 377) (1983), in which there was no knowledge of who lived on the premises or any information whatsoever that there were any controlled substances on the premises.

The more critical question is the scope of the warrant.

"A warrant which authorizes the search of a particular dwelling extends by implication to areas within the curtilage of the dwelling. 'Curtilage' has been defined as 'the yards and grounds of a particular address, its gardens, barns, [and] buildings.' [Cit.] . . . [A] driveway is properly considered within the curtilage of the dwelling it services, at least where the driveway is located on the dwelling owner's property." *Landers v. State*, 250 Ga. 808, 809 (301 SE2d 633) (1983).

Certainly "the concept of curtilage is more easily applied to land surrounding a single-family dwelling than to common areas surrounding a multi-family dwelling. When the area in question is a common area serving multiple dwellings, it is less likely that the residents of any one unit have an expectation of privacy or reasonably consider the area to be an extension of the dwelling." *Bayshore v. State*, 208 Ga. App. 828, 829 (432 SE2d 251) (1993). The undisputed facts here show that the driveway to the duplex inhabited by brothers, and its adjacent land, was within a common area curtilage which is reasonably an extension of each brother's dwelling. The area was not excluded from unit 251-B's curtilage merely because it was shared with unit 251-A.

As stated in *Bayshore*, supra at 829 (1), " ' "[w]hether the place searched is within the curtilage is to be determined from the facts, including the proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family." [Cit.]' " See also *Payton v. State*, 177 Ga. App. 104, 105 (1) (338 SE2d 462) (1985). The trial court even acknowledged that, if it were ruling on the curtilage of unit 251-B, it would conclude that the drugs were

within its curtilage.

The court erred in its resulting legal conclusion, that the illegality related to unit 251-A precluded the independent legality of the seizure as related to unit 251-B. The marijuana having been within the curtilage also of unit 251-B, it was lawfully seized pursuant to the search warrant authorizing the search of that unit.

The grant of Lorenzo Espinoza's motion to suppress is affirmed in part and reversed in part.

*Judgment affirmed in part and reversed in part. McMurray, P. J., Birdsong, P. J., Andrews and Johnson, JJ., concur. Pope, C. J., Cooper, Blackburn and Smith, JJ., concur in part and dissent in part.*

COOPER, Judge, concurring in part and dissenting in part.

I concur with the majority's conclusion that probable cause existed for the search warrant for unit 251-B. However, I dissent as to its conclusion that the marijuana was found within the curtilage of unit 251-B and was thus lawfully seized pursuant to the search of that unit. I would hold that the trial court properly concluded that the drugs were found within the curtilage of unit 251-A for which law enforcement authorities had no search warrant. The undisputed evidence established that the duplex, which consists of two completely separate residences, was served by one driveway which split to partially encircle the duplex; that unit 251-A is on the left side of the duplex; and that the marijuana was found on the left side of the driveway, i.e., on unit 251-A's side of the duplex. " 'The yard immediately surrounding one's dwelling is well within the curtilage.' " *Bunn v. State*, 153 Ga. App. 270, 274 (2) (265 SE2d 88) (1980). I believe residents of a duplex do have an expectation of privacy in the curtilage surrounding their individual units; certainly, it stands to reason that if A lives on one side of a duplex, he would not anticipate that a neighbor on the other side of the duplex would store his possessions on A's side of the duplex. Moreover, while the State argues that the marijuana was found within the common area of both units and that it was thus within the curtilage of unit 251-B and included in the search warrant for unit 251-B, oddly enough, the State did not charge Alex, the lessee of unit 251-B and the person to whom the search warrant was targeted, but instead charged Lorenzo, the lessee of unit 251-A with possession of the marijuana. I can think of no other reason for why the State would have charged Lorenzo with possession of the drugs and not Alex (the only person named in the search warrant) unless it considered the marijuana to be solely within the curtilage of Lorenzo's unit. As noted above, I believe the evidence was properly suppressed because it was found within the curtilage of unit 251-A for which law enforcement authorities did not have a search warrant.

The majority, however, concludes that the marijuana was found "within a common area curtilage which is reasonably an extension of each brother's dwelling" and relying on our decision in *Bayshore v. State*, 208 Ga. App. 828 (432 SE2d 251) (1993), holds that the marijuana was lawfully seized from the curtilage of unit 251-B. The majority further notes that it is irrelevant that the marijuana was also within the curtilage of unit 251-A. First, it hardly seems irrelevant that the marijuana was also found within unit 251-A's curtilage since the lessee of that unit was the only one charged with possession of the marijuana. Second, contrary to the majority's holding here, we held in *Bayshore* that "the common parking area was not part of the curtilage of the apartment and was not included in the search warrant issued in [that] case." 208 Ga. App. at 829. The rationale behind our decision in *Bayshore* appears to be that residents of a multi-family dwelling have no reasonable expectation of privacy in a common area nor do they "reasonably consider the area to be an extension of the dwelling." Id. The majority, however, while citing no authority other than *Bayshore*, holds that the common area where the drugs were found was "reasonably an extension of each brother's dwelling." I cannot adopt such reasoning since *Bayshore* appears to stand for the opposite proposition. Thus, even assuming the marijuana was not solely within unit 251-A's curtilage but was within a common area shared by both units, under the authority of *Bayshore*, I would hold that the "common [yard] area was not part of the curtilage of [unit 251-B] and was not included in the search warrant issued in this case." Id. For the foregoing reasons, I respectfully dissent.

I am authorized to state that Judge Blackburn and Judge Smith join in this dissent.

SMITH, Judge, dissenting in part.

While I join in Judge Cooper's dissent, I write separately to comment on the deterrent purpose of the exclusionary rule and the standard of review this court is to apply in cases of this kind.

I would affirm the trial court's ruling in all respects. There is no question that Lorenzo Espinoza's Fourth Amendment rights were violated when police searched unit 251-A of the duplex. There is likewise no question that the contraband was found on the 251-A side of the building. Without more, it is clear that suppression of the evidence found would be proper.

"[I]n *Michigan v. Tucker*, 417 U. S. 433, 447 (94 SC 2357, 41 LE2d 182) (1974), the United States Supreme Court stated: 'The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in wilful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained *as a result of such conduct*, the courts hope to instill

in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.'" (Emphasis supplied.) *State v. Patterson*, 143 Ga. App. 225, 226 (237 SE2d 707) (1977).

"Unless clearly erroneous, the trial court's ruling on disputed facts and credibility at a suppression hearing must be accepted on appeal. [Cit.]" *Dean v. State*, 250 Ga. 77, 80 (2a) (295 SE2d 306) (1982). This standard of review is to be applied regardless of whether the trial court's ruling was to grant or deny a motion to suppress. Keeping in mind the remedial nature of the exclusionary rule, the fact that Lorenzo Espinoza's Fourth Amendment rights were clearly violated, and the proper standard of review to be applied in considering rulings on motions to suppress, I am not prepared to hold that the trial court's decision was clearly erroneous merely because there is an arguable basis for justifying the search as being within the curtilage of unit 251-B. The trial court determined as a matter of fact that the evidence was the product of the illegal search of unit 251-A rather than the legal search of unit 251-B. I would defer to the trial court's determination on that matter since there is evidence to support it. Of course, I offer no opinion whether I would likewise affirm a contrary ruling by the trial court; that case is not now before us. In this case, I would merely find that the trial court's ruling is not clearly erroneous, and that it therefore should be affirmed.

I am authorized to state that Chief Judge Pope joins in this dissent.

DECIDED APRIL 1, 1994 — 

*Thomas J. Charron, District Attorney, Debra H. Bernes, Nancy I. Jordan, Assistant District Attorneys*, for appellant.
*Steve T. Woodman*, for appellee.