STATE OF MAINE
SOMERSET, ss.

REC'D & FILED
Wendy M. Robinson

AUG 11 2000

Clerk of Courts
Somerset County

SUPERIOR COURT
Docket No. CR-99-330
EAG - SOM - 8|11|2000

STATE OF MAINE

v.

VELLA GOGAN

ORDER ON MOTION TO SUPPRESS

DONALD L. GARBRECHT
LAW LIBRARY

AUG 23 2000

Vella Gogan has been charged with the murder of her husband, Gene Gogan.

Pending before the court is the defendant's motion, filed March 21, 2000, to exclude

all evidence obtained as a result of a search that occurred between October 5 and

October 7, 1999.[1]

The motion was argued on July 21, 2000, and counsel were allowed to submit

memoranda in support of their positions. The State's memorandum was received

on August 2, 2000. Defendant's was received on August 7, 2000.

## FINDINGS OF FACT

1. On October 3, 1999, Vella Gogan and her sister, Carlene Pelletier, went to

the Somerset County Sheriff's Department in Skowhegan, Maine. Once they

---

1. Defendant's motion to suppress statements made during an interview held on October 5, 1999, was withdrawn at the hearing. The State's motion to compel the defendant to submit to a psychological evaluation, initially filed November 10, 1999, remains pending. Defendant has been ordered to provide reports from her expert witnesses on or before October 1, 2000. After counsel for the State has had an opportunity to review those reports, he shall draft a proposed order, explaining to the examining psychologist, the questions that should be addressed in his/her evaluation. If counsel for the defendant agrees to the proposed order, it shall be submitted for signature to any Justice of the Superior Court. If the parties cannot agree upon the language to be used, a non-testimonial hearing shall be scheduled before this court.

1

arrived, Ms. Pelletier announced that Ms. Gogan had shot her husband and placed his body somewhere in the woods. After listening to Ms. Pelletier, Deputy Carl Gottardi informed Ms. Gogan of her Miranda rights. Ms. Gogan told him that she did not wish to answer any of his questions. Detective Gottardi told both women that the police would have to confirm Mr. Gogan was dead. Ms. Gogan responded: "It's true." Detective Gottardi then called to request assistance from the Maine State Police. Michael Mitchell, a detective from the Maine State Police, arrived soon thereafter.

2. Detective Mitchell took Ms. Pelletier to another room and asked for additional information about the alleged homicide. When he had completed his interview, he asked Ms. Gogan if she would answer his questions. She refused. However, at some point later, Ms. Gogan did generally confirm the information provided by her sister by stating: "He's dead."

3. After both women had left the Sheriff's Department, Detective Mitchell contacted Assistant Attorney General (AAG) Fernand LaRochelle. Detective Mitchell explained what he had learned from Ms. Pelletier, and requested assistance in obtaining a search warrant. AAG LaRochelle prepared a handwritten two-page affidavit and request for search warrant form, and an additional five-page affidavit, also handwritten. The information contained in the affidavit was based entirely upon what Ms. Pelletier had disclosed to the detectives. Included in the affidavit was her report that Ms. Gogan had "placed the body in their pickup truck and drove the body away . . . ." Based upon his conversations with AAG LaRochelle, Detective

2

Mitchell intended to request permission to search Ms. Gogan's home, garage, and truck for blood, bloodstains, bloodstained items, firearms, bullets, expended cartridges, and hairs and fibers.

4. The affidavit and search request form, with its attached affidavit, was to be signed by Detective Mitchell in front of a District Court Judge or a Complaint Justice. All of these documents were faxed to Detective Mitchell by AAG LaRochelle.

5. AAG LaRochelle may have also prepared an actual "form" warrant to be signed by the judge or complaint justice. However, that warrant has never been found.

6. While AAG LaRochelle was preparing the paperwork, Detective Mitchell attempted to track down a judicial officer. When he was unable to reach either of the two local District Court judges, he tried to find a complaint justice. After one or more unsuccessful attempts, Detective Mitchell was finally able to reach Attorney J. Michael Talbot, a Justice of the Peace. Attorney Talbot agreed to review the documents and made arrangements for the detective to come to his home in Waterville.

7. Detective Mitchell arrived at Attorney Talbot's home sometime after 10:00 p.m. The detective swore to the truth of the statements contained in the affidavit, and signed the form request in front of Attorney Talbot. Defendant's exhibit B includes the original document signed by Detective Mitchell and witnessed by Attorney Talbot.

3

8. Attorney Talbot determined that the detective had probable cause to initiate a search on October 3, 1999, and told him he was "all set." However, neither Attorney Talbot nor Detective Mitchell was able to recall whether a warrant was actually signed on that day. For purposes of this motion, the court finds that no warrant was ever signed.

9. When Detective Mitchell left Attorney Talbot's home, both he and Attorney Talbot believed that the detective was in possession of all documents necessary to initiate a legal search.

10. At approximately 12:00 a.m. on October 4, 1999, law enforcement agents began to search Ms. Gogan's home, the attached garage, and a pickup truck parked in the garage. Although they left the premises approximately one hour later, the search resumed the following morning, and continued until sometime on October 7, 1999.

11. At approximately 10:00 a.m. on October 4, 1999, Detective Mitchell met with Sergeant Drake at the Gogan property. As he handed over all of the paperwork to Sergeant Drake, Detective Mitchell realized that he did not have a warrant.

12. Because he was convinced that he had received a signed warrant from Attorney Talbot, Detective Mitchell began a methodical search to discover where it had been left.

13. On October 5, 1999, Detective Mitchell obtained information from one of the searching officers that caused him to believe that Ms. Gogan had used black

4

plastic garbage bags to remove her husband's remains from the house. Based upon that information, he prepared a set of documents to request a second search warrant.

14. Detective Mitchell went to Attorney Talbot's office in Skowhegan on October 5, 1999, with the second set of documents. There he swore to the truth of the information contained in the affidavit, and signed the request for a warrant in front of Attorney Talbot. Attorney Talbot witnessed his signature, determined that the detective had probable cause to initiate the search, and signed a search warrant. Those documents were admitted as defendant's exhibit C. During the course of that interaction, Detective Mitchell mentioned the "missing" warrant to Attorney Talbot. Mr. Talbot did not tell him that he had never signed a warrant.

15. At some point later, Detective Mitchell finally determined that he had never received a warrant granting permission for the search that was initiated on October 4, 1999. On October 7, 1999, in order to correct that omission, he resubmitted the documents prepared on October 3, 1999, to Attorney Talbot. Attorney Talbot signed a search warrant on October 7, 1999, after the search had been completed. That warrant is also contained in the package of documents admitted as defendant's exhibit B.

### CONCLUSIONS OF LAW

Searches or seizures conducted without a warrant are *per se* unreasonable, except for a few exceptions. *State v. Rand*, 430 A.2d 808, 817 (Me. 1981). Because there was no warrant, the burden is on the State to prove, by a preponderance of the evidence, that the search of Ms. Gogan's home, truck, and garage search falls within

5

one of those exceptions. The State has asserted that the search was permissible under the good faith exception adopted by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). In *Leon, supra*, the Supreme Court held that, when a law enforcement agent acting in good faith has obtained a search warrant from a neutral judicial officer and has acted within its scope, evidence seized as a result of the search will not be excluded, even if the warrant is later determined to be invalid.

The State has acknowledged that Detective Mitchell did not have a warrant before the search began on October 4, 1999. However, it argued that the good faith exception applies because Detective Mitchell was granted permission to initiate the search when Attorney Talbot told him he was "all set," and because Detective Mitchell *believed* he was in possession of a valid warrant.

Defendant argued that, while it is possible that the detective left Attorney Talbot's house without realizing he did not have a warrant, he should have noted its absence before he initiated the search. In addition, the defendant argued that, at a minimum, the search should have been aborted as soon as Detective Mitchell realized he did not have a warrant. That occurred sometime on October 5 or 6.

In *United States v. Calandra*, 414 U.S. 338 (1974), the Supreme Court noted that the exclusionary rule was a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 348. In *Leon, supra*, the Court cautioned that its use should be limited to "those unusual cases in which

6

exclusion will further [its] purpose . . . ." *Id.* at 918. The purpose is, quite simply, deterrence of police misconduct:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

*Michigan v. Tucker,* 417 U.S. 433, 447 (1974).

Detective Mitchell did not attempt to mislead the complaint justice, nor did he attempt a search without obtaining permission from a judicial officer. He acted in good faith in discussing his affidavit with AAG LaRochelle, and in submitting the affidavit for scrutiny by a judicial officer. Detective Mitchell did err in failing to present the actual warrant form to Attorney Talbot for his signature. He made another error when he realized the warrant was "missing." However, the court is satisfied that the warrant from Attorney Talbot had been misplaced before or during the search. Based upon the statement of Attorney Talbot, this was a reasonable belief. Once he was convinced that no warrant existed, Detective Mitchell returned to Attorney Talbot to try to correct his mistake.

The officers in *Leon* had a warrant that was later determined to be invalid. In this case, Detective Mitchell never had a warrant, although he believed that he did. This court must determine whether Detective Mitchell's search was conducted in good faith and whether his actions were objectively reasonable. Based upon the evidence presented, the court determines that Detective Mitchell took every step

7

that could be expected in obtaining a warrant. As noted above, he discussed the information received with AAG LaRochelle and, with his assistance, drafted an accurate affidavit for review by a judicial officer. He attempted to have the affidavit reviewed by a judge and, when that proved impossible, arranged to have it reviewed by a justice of the peace. All of these actions demonstrate his good faith.

The information contained in Detective Mitchell's affidavit established probable cause that a crime had been committed, and that evidence of the crime would be found in Ms. Gogan's home, garage, and/or truck. *United States v. Feliz*, 182 F.3d 82 (1st Cir. 1999). Attorney Talbot testified that, based upon the information presented to him, he gave Detective Mitchell permission to begin the search of Ms. Gogan's home, garage, and truck. If a warrant had been signed, it would have been valid, as the information contained in the affidavit supported a determination that Mr. Gogan had been killed in his house.

Detective Mitchell did not initiate the search until he was told he was "all set." Given that directive, Detective Mitchell's belief that he had authority to conduct a search was reasonable. As the Supreme Court noted in a case decided during the same term it issued *Leon*: "We refuse to rule that an officer is required to disbelieve a judge who just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *Massachusetts v. Sheppard*, 468 U.S. 981, 989-990 (1984). While there was no paper warrant, Attorney Talbot did tell Detective Mitchell that he could start the search. The court will not fault the detective for believing that statement.

8

There was no misconduct by Detective Mitchell, and no purpose would be served by excluding the evidence obtained as a result of the search he conducted. It is not likely that Detective Mitchell—or any other law enforcement officer—will now make it a practice to "forget" to have warrants signed. Suppression is appropriate only when the officer has no reasonable ground for believing that the search has been authorized.

## ORDER

Based upon the findings and conclusions above, the court denies the defendant's motion to suppress. The clerk is directed to incorporate this order in the docket by reference.

Dated: August 10, 2000

Ellen A. Gorman
Justice, Superior Court

## DOCKET RECORD

DOB: 05/07/1944

Attorney: M MURPHY, *One Center St, Waterville*   State's Attorney: ANDREW BENSON

APPOINTED 10/20/1999

Attorney: JANET MILLS, *P Box 9, Skowhegan*

APPOINTED 10/20/1999

DONALD L. GARBRECHT
LAW LIBRARY

AUG 23 2000

Filing Document: BOUNDOVER COMPLAINT          Major Case Type: HOMICIDE

Filing Date: 11/30/1999

## Charge(s)

1   MURDER                          10/03/1999 HARTLAND              MITCHELL              / MSP

17-A   201(1)(A)          Class M

## Docket Events:

12/01/1999 FILING DOCUMENT - BOUNDOVER COMPLAINT FILED ON 11/30/1999

12/01/1999 Charge(s):  1
      TRANSFER - PERMANENT RECVD BY COURT ON 11/30/1999

      DISTRICT COURT DKT NO. CR-99-2087
12/01/1999 Charge(s):  1
      TRANSFER - PERMANENT RECVD BY COURT ON 11/30/1999

      DISTRICT COURT DKT NO. CR-99-2087 (BOUNDOVER)
12/07/1999 SUPPLEMENTAL FILING - SUPERSEDING INDICTMENT FILED ON 12/07/1999

12/07/1999 HEARING - ARRAIGNMENT SCHEDULED FOR 12/09/1999 a 8:30

      HEARING TO BE HELD IN KENNEBEC SUPERIOR COURT.  CC:  AAG BENSON, ATTY MURPHY AND ATTY
      MILLS
12/07/1999 NOTICE - ARRAIGNMENT SENT ON 12/07/1999

12/08/1999 PSYCHIATRIC EXAM - STAGE ONE REPORT FILED ON 12/08/1999

      CC:  ATTYS MILLS AND MURPHY AND AAG BENSON
12/08/1999 OTHER FILING - OTHER DOCUMENT FILED ON 12/08/1999

      LETTER FROM AAG BENSON - REQUESTING THE THE NO CONTACT PROVISION OF NICOLE AND SONYA WIERS
      BE DELETED.   APPROVED.  DATED: 12/13/99 S/ MARDEN, J.  CC:  AAG BENSON, ATTYS MURPHY AND
      MILLS
12/10/1999 OTHER FILING - TRANSCRIPT ORDER FILED ON 12/06/1999

      (FOR HARNISH HEARING ON 11/17/99)  CC:  ELECTRONIC RECORDING
12/10/1999 HEARING - ARRAIGNMENT HELD ON 12/09/1999
      DONALD H MARDEN , JUSTICE
      Attorney:  M MURPHY

      DA:  ANDREW BENSON          Reporter: PHILIP GALUCKI