TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00469-CR






Kristofer Marsh, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT


NO. 1010659, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING






O P I N I O N




 Appellant Kristofer Marsh appeals his conviction for possession with intent to
distribute four grams or more but less than 200 grams of cocaine. See Tex. Health & Safety Code
Ann. §§ 481.102(3)(D), .112(d) (West 2003). The jury assessed appellant's punishment at
imprisonment for sixty-five years. 

 Appellant asserts that the trial court erred in denying his motion to suppress evidence,
in overruling his challenge of a prospective juror, in failing to grant a severance, and in admitting
inadmissible evidence at the punishment phase of trial. We will affirm the judgment of conviction,
but because of error at the punishment phase of the trial, we will reverse and remand the cause to the
trial court for a new trial on punishment only. See Tex. Code Crim. Proc. Ann. art. 44.29(b) (West
Supp. 2003).


SEARCH--NO-KNOCK ENTRY

 In his third point of error, appellant asserts that the trial court erred "by denying
appellant's motion to suppress evidence because the evidence was discovered after the police made
a no-knock, dynamic entry not authorized by the search warrant or information known to the
officers." An appellate court reviews a trial court's ruling on a motion to suppress evidence under
an abuse of discretion standard. See Balentine v. State, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002);
Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). Appellate courts give great deference
to a trial court's determination of historical fact. Johnson v. State, 68 S.W.3d 644, 652 (Tex. Crim.
App. 2002); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When, as here, the trial
court does not file findings of fact, we assume the court made implicit findings that support its
ruling, so long as those implied findings are supported by the record. See Maxwell v. State, 73
S.W.3d 278, 281 (Tex. Crim. App. 2002); State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000). We review de novo mixed questions of law and fact that do not turn on the credibility and
demeanor of witnesses. Johnson, 68 S.W.3d at 652; Guzman, 955 S.W.2d at 89. 

 The Fourth Amendment to the Constitution protects "[t]he right of people to be secure
in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.
Const. amend. IV. In evaluating the scope of Fourth Amendment rights, we must look to the
traditional protections against unreasonable searches and seizures afforded by the common law at
the time of the framing of the Constitution. See Wilson v. Arkansas, 514 U.S. 927, 931 (1995). 
Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was
among the factors to be considered in assessing the reasonableness of a search and seizure. Id. at
934. However, the Fourth Amendment's flexible requirement of reasonableness should not be read
to mandate a rigid rule of announcement that ignores countervailing law enforcement interest. Id. 
The common law principle of announcement was never stated as an inflexible rule requiring
announcement under all circumstances. Id. The Supreme Court's unanimous opinion said: "We
simply hold that although a search or seizure of a dwelling might be constitutionally defective if
police officers enter without prior announcement, law enforcement interest may also establish the
reasonableness of an unannounced entry." Id. at 936. The Supreme Court left "to the lower courts
the task of determining the circumstances under which an unannounced entry is reasonable under
the Fourth Amendment." Id. at 936. 

 It is the duty of a court confronted with the question to determine whether the facts
and circumstances of the particular entry justified dispensing with the knock-and-announce
requirement. Richards v. Wisconsin, 520 U.S. 385, 394 (1997). In order to justify a "no-knock"
entry, the police must have a reasonable suspicion that knocking and announcing their presence
under the particular circumstances would be dangerous or futile, or that it would inhibit the effective
investigation of the crime by, for example, allowing the destruction of evidence. Id. This
standard--as opposed to a probable cause requirement--strikes the appropriate balance between the
legitimate law enforcement concerns at issue in the execution of search warrants and the individual
privacy interests affected by no-knock entries. Id. The showing of a reasonable articulable suspicion
of danger to make a no-knock entry is necessary. "This showing is not high, but the police should
be required to make it whenever the reasonableness of a no-knock entry is challenged." Id. at 394-95. 

 A SWAT team, having as one of its duties assistance in high-risk warrant service,
assisted the officers serving the warrants in this case. Police entered appellant's apartment that he
shared with Kimberly Haley to serve a warrant issued to search the apartment and a warrant issued
for appellant's arrest. Both the search warrant and the arrest warrant were issued in the same
homicide case. The officers did not knock and announce their presence before entering the
apartment; they used a "flash-bang" diversionary device outside of the apartment window, and they
then used a heavy "breaching tool" to force open the apartment door. Appellant argues that the
evidence is insufficient to show the officers had a reasonable concern for their safety so as to allow
them to enter the apartment without knocking and announcing their presence. On the other hand,
the State argues that the evidence and the circumstances show the forceable no-knock entry into
appellant's apartment was justified. 

 Because of their apprehension of danger in serving the warrants, the officers
maintained a surveillance of the apartment prior to the search. Also, the officers obtained from the
apartment manager a copy of the floor plan of the three bedroom apartment. The officers asserted
that their decision to forcibly enter the apartment without knocking and announcing their presence
was to alleviate their concern for their own safety as well as the safety of the occupants of the
apartment. The officers had reliable information that appellant had in his possession in the
apartment a nine millimeter Glock handgun and an SKS assault rifle. The officers knew of "a couple
of previous weapons charges against Kristofer Marsh." The officers knew that Haley and appellant
were then free on bond having been recently charged with a first degree felony offense; when
arrested for that offense, appellant had a firearm in his possession. Most importantly, the officers
had evidence and knew that appellant was capable of aggressive, violent behavior on slight
provocation. The warrants that the officers intended to serve were issued on a showing of probable
cause that appellant, using a baseball bat, brutally beat and killed a strong, healthy young man. 
Appellant's provocation for killing the man was Haley's complaint to appellant about the man's
alleged misbehavior toward her on a night club dance floor. Both appellant and Haley had boasted
about appellant's heinous criminal act. 

 Giving proper deference to the trial court's ruling refusing to suppress the evidence,
we conclude that the trial court did not abuse its discretion in finding that the officer's no-knock,
unannounced, forcible entry into the apartment was justified. The evidence and the circumstances
support the court's implied finding that the officers had a reasonable suspicion that their lives, and
the lives of the occupants of the apartment, would be endangered if they knocked and announced
their presence before entering the apartment to serve the warrants. Moreover, in our independent
de novo review of the mixed questions of law and fact, not depending on the credibility and
demeanor of the witness, we find that the overruling of the motion to suppress is supported by the
evidence and circumstances shown. Appellant's third point of error is overruled. 


SEARCH WARRANT--DESCRIPTION OF ITEMS


 In his first point of error, appellant insists that the "trial court erred in denying a
motion to suppress evidence because the evidence was discovered after officers exceeded the
authority granted by the search warrant and engaged in an exploratory search." Appellant argues that
the warrant authorizing the search of the apartment did not authorize a search of the safe in which
the officers found the cocaine he was charged with possessing. As we have already stated, abuse of
discretion is the standard by which a trial court's ruling on a motion to suppress evidence is
reviewed. See Balentine, 71 S.W.3d at 768; Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim.
App. 1996). 

 The search warrant authorized officers to search for and seize, among other things,
"rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase
receipts, sales receipts and photographs." These items could be concealed in the small safe the
officers opened. When the safe was opened the officers saw the cocaine and immediately
discontinued their search until another search warrant authorizing the seizure of the contraband was
obtained. The evidence does not show that the officers engaged in an exploratory search
unauthorized by the first search warrant. The trial court did not abuse its discretion in overruling
appellant's motion to suppress the evidence. Appellant's first point of error is overruled. 

 In his second point of error, appellant complains that the "trial court erred in denying
appellant's motion to suppress because the search warrant described some of the items sought in
such an unconstitutionally vague manner as to invite an exploratory search." This complaint relates
to items enumerated as: "(A) bat or similar blunt object, (B) black short sleeve button up shirt with
a collar, (C) light colored pants, (D) shoes, (E) blood, (F) hair, (G) any articles of personal property
tending to establish that the above listed individuals (Kristofer Marsh or Kimberly Haley) has or had
dominion and control over the place and premises searched, including rent receipts, utility bills,
telephone bills, addressed mail, personal identification, keys, purchase receipts, sales receipts and
photographs, (H) tape." 

 The only authority cited by appellant relating to this point of error is Walthall v. State,
594 S.W.2d 74 (Tex. Crim. App. 1980). In that case the court condemned and disapproved the
description of "all items of personal property commonly used in the commission of a criminal
offense and in particular the offense of commercial exhibition of obscene material" and "all
implements or instruments used in the commission of a crime." Id. at 78. In Walthall, the court held
that although the description of film passed specificity muster, the two clauses just quoted were
"unconstitutionally general" and that they "clearly authorize[d] a general, exploratory rummaging
which is properly prohibited by the constitutions of this State and of the United States." Id. at 78-79.

 Appellant concedes "the faulty averments from Walthall are truly general on their
face; '[l]anguage of greater generality is difficult to imagine.' Walthall, 594 S.W.2d at 79." 
Appellant then argues, "In contrast, the objectionable list from the instant cause is facially very
specific as to the particular items being sought. Nevertheless the end result is the same." We
disagree. The descriptions of the items in the warrant and warrant affidavit in this case are not
unconstitutionally vague. The trial court did not err in overruling the appellant's motion to suppress
the evidence. Appellant's second point of error is overruled. 


FRUIT OF POISONOUS TREE DOCTRINE NOT APPLICABLE


 In his fourth point of error, appellant urges that the trial court erred in denying his
motion to suppress evidence because the "cocaine discovered in a safe was found as a result of
custodial interrogation without benefit of Miranda warnings." The record reflects:


THE STATE: Now, after the arrest warrant was executed, what did you 
do then?

DETECTIVE GERRISH: Ms. Marsh [Haley] and Mr. Marsh were then handcuffed
and taken down to the station, but prior to them leaving,
when we made entry into the house, we noticed a bunch
of keys sitting on top of the kitchen counter and so we--I
asked Mr. Marsh specifically which keys belonged to
him, and he advised me that the keys that were wrapped
around a lanyard were his keys because we were going to
be seizing a vehicle and we wanted to know where the
keys were. 



Appellant had not been advised of his rights according to the requirements of Miranda (1) when he told
Detective Tracy Gerrish that the keys were his. Using one of the keys Gerrish opened the safe in
which the cocaine was found. 


The "fruit of the poisonous tree doctrine" . . . does not apply to mere violations of the
prophylactic requirements in Miranda: while the statement taken in violation of
Miranda must be suppressed, other evidence subsequently obtained as a result of that
statement (i.e. the "fruits" of the statement) need not be suppressed. Michigan v.
Tucker, 417 U.S. 433, 452, 94 S.Ct. 2357, 41 L.Ed.2d 182 . . . (1974); Oregon v.
Elstad, 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 . . . (1985). The rule . . .
requires suppressing the fruits of a defendant's statement only when the statement
was obtained through actual coercion. Tucker, 417 U.S. at 448-449, 94 S.Ct. at
2365-67; Elstad, 470 U.S. at 314; 105 S.Ct. at 1296. 



Baker v. State, 956 S.W.2d 19, 22 (Tex. Crim. App. 1997); Montemayor v. State, 55 S.W.3d 78, 90
(Tex. App.--Austin 2001, pet. ref'd). The trial court did not abuse its discretion in denying
appellant's motion to suppress evidence. Appellant's fourth point of error is overruled. 


JUROR CHALLENGE


 In his fifth point of error, appellant claims that the trial court erred in overruling his
challenge of a prospective juror for cause. Before an appellant can claim that he was harmed by a
trial court's denial of a defense challenge for cause, the record must show that (1) he exhausted all
of his preemptory challenges, (2) he requested more challenges, (3) his request was denied, and (4)
he identified an objectionable person seated on the jury upon whom he would have exercised a
peremptory challenge. Martinez v. State, 17 S.W.3d 677, 682 (Tex. Crim. App. 2000); Anson v.
State, 959 S.W.2d 203, 204 (Tex. Crim. App. 1997). In the trial court, appellant followed the
procedural steps outlined and preserved for appellate review the error claimed. Therefore, we must
determine whether the trial court erred in refusing to grant appellant's challenge of prospective juror
Cynthia Horacek for cause.

 Appellant argues that "objection to Horacek rested on grounds that she could not
follow the burden of proof beyond a reasonable doubt." However, appellant "concedes that Horacek
did not herself affirmatively state explicit disagreement with the reasonable doubt standard on the
record." 

 In a lengthy, convoluted argument, (2) appellant urges that "the record leaves the
impression that Horacek had difficulty in holding the State to the reasonable doubt standard of
burden of proof upon which the defense is entitled to rely . . . . the trial court abused its discretion
in denying the challenge for cause." 

 

of proof beyond a reasonable doubt? Can you all do that? Is there anyone here
that is willing to admit to me in all honesty that they may not be able to do that
under circumstances where the proof is less than beyond a reasonable doubt but
it is more than a preponderance of the evidence?


. . .


VENIREPERSON NABORS: If my gut told me they were guilty, I don't know
that I could sign a not guilty. I really don't think I could.


[Defense Counsel]: What is your name, ma'am?


VENIREPERSON NABORS: Jill Nabors


[Defense Counsel]: Anyone else feel that way?


VENIREPERSON HORACEK: Cindy Horacek. If we are asked to prove--if the
District Attorney proves that they are guilty and I feel that that is a true statement,
then are you going to say technicalities not guilty [sic]? I am going to have
trouble with that.


Appellant concedes that Horacek did not herself affirmatively state explicit
disagreement with the reasonable doubt standard on the record. However, her
fellow panel member Nabors had provided a rather explicit answer to [defense
counsel's] line of questioning. Without further elaboration, Nabors' answer--"If
my gut told me they were guilty, I don't know that I could sign a not
guilty"--conveys a fundamental disagreement with the reasonable doubt
standard. By answering "Cindy Horacek" to [defense counsel's] question
"anybody else feel that way?," venireperson Horacek not only identified herself,
she also signified her agreement with Nabors' stated position on reasonable
doubt. The tenor of Horacek's follow-up question, when evaluated according to
the context of defense counsel's preceding discussion of reasonable doubt,
further indicates that her intent in taking the opportunity to speak was to express
her discomfort with the concept of reasonable doubt. She was therefore subject
to a challenge for cause.


 The denial or grant of a challenge for cause is within the discretion of the trial court
and will not be overturned absent an abuse of that discretion. Mooney v. State, 817 S.W.2d 693, 701 
(Tex. Crim. App. 1991). The reviewing court examines the record as a whole to determine whether
there is support for the trial court's decisions, and, in doing so, gives great deference to the trial
court. Satterwhite v. State, 858 S.W.2d 412, 415 (Tex. Crim. App. 1993). The trial court is able to
consider such factors as demeanor and tone of voice that do not come through when reviewing a cold
record. Mooney, 817 S.W.2d at 701. The trial court's decision is accorded great deference. Id. 

 After examination of the record, and the appellant's argument, we conclude that
appellant has failed to demonstrate that Horacek, if she had been allowed to serve, would not have 

properly applied the reasonable doubt standard. Appellant has failed to show that the trial court
abused its discretion in refusing to grant appellant's challenge of Horacek for cause. Appellant's
fifth point of error is overruled. 


REFUSAL TO SEVER


 In his sixth point of error, appellant complains that the trial court erred in refusing to
grant his motion for severance because a joint trial was prejudicial. Appellant argues that the court 

erred in failing to grant him a separate trial at the guilt or innocence phase of trial and in the
alternative at the punishment phase of trial. 


Art. 36.09. Severance on separate indictments


 Two or more defendants who are jointly or separately indicted . . . for
the same offense . . . may be, in the discretion of the court, tried jointly or separately
as to one or more defendants; . . . and provided further, that in cases in which, upon
timely motion to sever, and evidence introduced thereon, it is made known to the
court that there is a previous admissible conviction against one defendant or that a
joint trial would be prejudicial to any defendant, the court shall order a severance as
to the defendant whose joint trial would prejudice the other defendant or defendants.



Tex. Code Crim. Proc. Ann. art. 36.09 (West 1981). 

 Before trial the State agreed that it would not offer in evidence at the guilt or
innocence phase of trial any prior convictions of appellant and it appears the co-defendant Haley had
no previous convictions. Therefore, appellant was not entitled to severance and a separate trial as
a matter of right under the provisions of article 36.09 of the code of criminal procedure. Appellant's 
motion for severance was filed after the trial commenced and was therefore untimely. Appellant
relies upon the motions for severance filed by the co-defendant, Haley. Appellant states that
appellant joined the co-defendant's "earlier motions retroactively by leave of court" and argues:
"contrary to traditional notions of standing the fact that [the co-defendant's] motions were presented
from [co-defendant] Haley's standpoint is immaterial, as the plain wording of the statute indicates
('. . . or that a joint trial would be prejudicial to any defendant. . . .,' TX C.C.P. 36.09, emphasis
supplied)." Appellant cites no supporting authority and we find his contention untenable. Moreover,
although counsel, particularly counsel for Haley, made extensive argument at trial concerning the
issue of severance, no evidence was offered to support the motions for severance before they were
overruled by the trial court. On appeal, appellant fails to show specifically how he was prejudiced
by being tried with the co-defendant Haley. If either defendant was prejudiced by being tried with
the co-defendant it was Haley at the punishment phase of the trial. 

 Absent evidence of prejudice to one defendant in a joint trial, or evidence that one
of the defendants has a prior admissible conviction, a motion for severance is left to the trial court's
discretion. King v. State, 17 S.W.3d 7, 16-17 (Tex. App.--Houston [14th Dist.] 2000, pet. ref'd);
Patterson v. State, 783 S.W.2d 268, 270 (Tex. App.--Houston [14th Dist.] 1989, pet. ref'd). When
an accused is not entitled to a severance as a matter of right, the denial of a severance motion by the
trial court constitutes an abuse of discretion only when the movant satisfies the heavy burden of
showing clear prejudice. Id. Moreover, the mere allegation that prejudice will result is not evidence
of, or a sufficient showing of, prejudice under article 36.09, particularly when the severance is
discretionary with the trial judge. Id. If the motion to sever is not supported by evidence, its denial
is not an abuse of discretion. Id. Here, appellant has not met his heavy burden of showing clear
prejudice. The trial court did not abuse its discretion in overruling appellant's motion for severance. 
Appellant's sixth point of error is overruled. 


VICTIM IMPACT EVIDENCE

 In his seventh point of error, appellant asserts that the trial court erred at the
punishment phase of the trial by admitting victim impact evidence relating to an extraneous offense. 
The State contends that appellant has mischaracterized the complained of testimony of Arleen
Adelman as victim impact evidence, but argues that if the testimony is victim impact evidence, it is
relevant and its value is not substantially outweighed by the danger of unfair prejudice. 

 At the punishment phase of trial, the State offered the testimony of twelve witnesses
to prove beyond a reasonable doubt that appellant had murdered Michael Adelman--an extraneous
offense. (3) One of these witnesses, who testified before Arleen Adelman, was Dr. Elizabeth Peacock,
the deputy medical examiner; she testified about Michael Adelman's injuries, the cause of his death,
and that his organs had been donated for the use of others. The last witness was Arleen Adelman,
the mother of Michael Adelman. Before Arleen Adelman was allowed to testify about the evidence
complained of, counsel for both defendants objected on the ground that Arleen Adelman's testimony
would not be relevant. The objections were overruled. Counsel then asked the court "for a 403
balancing," which the court overruled. 

 Arleen Adelman testified about the family's ordeal while Michael Adelman was 


hospitalized:




 When you got to the hospital, tell me what you saw.




 Michael Girard was there and there was a girl crying in the other room and I
found out later--I didn't remember that that was Keith, but that was the girl that
had witnessed what had happened that night. And she was hysterical, as we all
were, and then they took us to see Mike. And he was just not moving or
speaking or--his eyes were open, but he wasn't seeing anything.




 Was he in a hospital bed?




 Yes, ma'am, with many plugs and tubes and everything imaginable. His head
was shaved, which was such a shock, but there were staples all across the top of
his head where his scalp had been fractured. I remember thinking how could his
head be broken open that way. But they had an intracranial module in his head
by the time we saw him, so there was a big plug on top of his head where they
could monitor his swelling and brain activity.




 Prior to seeing him, Ms. Adelman, was your son a pretty healthy, fit person?




 He was very healthy. He was very conscious about his health. He didn't smoke. 
He didn't do drugs. He was always working out. I am sure he worked out even
when he traveled. He would make sure he stayed at hotels where there was a
gym. He loved sports. He was very, very active in every sport.




 When you saw him like this, were you able to communicate with him at all?




 No, ma'am.




 Was your family and were there friends there?




 There were friends there all the time. We were only allowed to go in once every
hour or set times that we could go in. We had to keep the activity down because
it seemed like a lot of his friends would want to come in and talk to him and
there was a lot of crying going on and we would watch the gauge and it would
move his intracranial pressure. So we were told to keep kind of quiet. But we
were praying. We had priests there. We had a lot of people going in and out.




 It sounds like he was in an intensive care unit; is that right?




 Yes, ma'am, the trauma unit.



Q. How long was he there?



 He died on the sixth day, so I guess he was there five days.




 When he was there, was there any indication that he might get better?




 Yes, ma'am. We were real hopeful at one point because he had started moving
around and his eyes were tracking us. He seemed to have messages that he was
getting across. He kept moving his hand and I know he was telling me to undo
the restraint on his arm. He was trying to pull out plugs and tubes and things,
and he was fighting so hard to live. 




 Was there--did you get information--tell me, did that change?




 Yeah. We thought he was getting better. I had even been told that we should
try to look for a therapy center, that he probably would not--he wouldn't have
been able to speak or possibly walk. We knew the damages were dreadful, but
we did think he was doing better and we left the hospital that night.



 He was doing a lot of movement and stirring a lot. He was trying to get out of
the bed and he was moving to the end of the bed. I remember once my husband
kind of held him down and we kept telling him that he was all right and that we
thought he was coming out of the coma. I guess he was still in a semi-coma.


 But that night when we went home, a nurse called me and said that we had better
come back to the hospital, that he had taken a turn for the worse.


 And we had already been approached by a pulmonary doctor because they did
remove him from the respirator and they had taken the intracranial module out
of his head. So that was a good sign, but then they felt like fluid was developing
in his lungs so they need to put him back on the respirator. So the pulmonary
doctor said things aren't looking good.


 I remember saying, he is so healthy and so strong, he can lick pneumonia. But
then a neurologist called and said that they needed to do another--I don't know
if it was a CT scan or some type of brain activity test and they would have to put
the module back into his skull. They found a brain stem bleed and so due to that
bleeding he went into a deeper coma and his eyes no longer tracked us or he
didn't look at us. He just laid there and never moved again. 



 From that point, ma'am, did you get information that he was then declared brain
dead?




 Yes, ma'am.




 And did the family have to make a decision?




 We knew both Matt's and Mike's wishes concerning their organs. They had it
on their driver's license. It was a hard decision, but we knew that's what Mike
would have done. Mike would have done anything for his friends or his family. 
He was that type person. He would have been proud that he could give life to
other people.




 So Mike Adelman donated organs?




 We have heard from the ex-policeman that has his heart and he is doing very
well. He just says it was a miracle. There are three other people that received
kidneys and liver and other organs. They are all doing well. We haven't heard
from them. (4) 




Following Arleen Adelman's testimony, counsel renewed their objections and asked the court to
instruct the jury to disregard the testimony. The court refused to so instruct the jury. 


The danger of unfair prejudice to a defendant inherent in the introduction of "victim
impact" evidence with respect to a victim not named in the indictment on which he
is being tried is unacceptably high. The admission of such evidence would open the
door to admission of victim impact evidence arising from any extraneous offense
committed by a defendant. Extraneous victim impact evidence, if anything, is more
prejudicial than the non-extraneous victim impact evidence. . . . [S]uch evidence is
irrelevant under Tex. R. Crim. Evid. 401.



Cantu v. State, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997); see also Boston v. State, 965 S.W.2d
546, 550-51 (Tex. App.--Houston [14th Dist.] 1997, no pet.). Appellant was being tried for the
offense of possession of cocaine with the intent to deliver--not for murder. The indictment charging
the offense named no victim. It was error to admit evidence in the nature of victim impact evidence
relating to the extraneous offense of murder. Moreover, before being admitted in a proper case,
victim impact evidence is subject to the limitations imposed by Texas Rule of Evidence 403. 
Ripowski v. State, 61 S.W.3d 378, 390 (Tex. Crim. App. 2001); Mosley v. State, 983 S.W.2d 249,
265 (Tex. Crim. App. 1998).

 Having determined that the evidence was erroneously admitted, we must decide
whether the admission of this evidence was so harmful as to require a new trial on punishment. The 
error complained of is not of constitutional dimension. Other than constitutional error, any error that
does not affect an appellant's substantial rights must be disregarded. Tex. R. App. P. 44.2(b). A
substantial right is affected when the error had a substantial and injurious effect or influence in
determining the jury's verdict, King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997), Roberts
v. State, 29 S.W.3d 596, 602 (Tex. App.--Houston [1st Dist.] 2000, pet. ref'd); or leaves one in
grave doubt whether it had such effect. Espinosa v. State, 29 S.W.3d 257, 259 (Tex. App.--Houston
2000, pet. ref'd). 

 During closing argument, the prosecutor characterized the complained of testimony
of Arleen Adelman as victim impact evidence, arguing: 


The call to his family, the call at 3:00 o'clock in the morning as his family get the
phone call that their strong, healthy son has been injured. And as they go and they
tell and they rush to the hospital praying please, please, he will be okay. What do
they see?


This is what the mother and father see. This is what happens to Michael Adelman. 
So as the hospital is filled with family and friends as they comfort him, as the mother
and father touch him and say it's going to be okay, mom is here. It's going to be
okay. Dad is here. You are going to pull out of this. Every day praying, praying and
hoping. God, help our baby.


I believe the way that this--everything you have heard that they both should get,
absolutely without a question should get a life sentence, both of them. Kristofer
Marsh life, Kim Haley life. For everything they have done to this community, for
everything they have done to the Adelman family, for everything they have done to
Michael Adelman.


You see, ladies and gentlemen, if that happens, then the family can go to the grave
of Michael Adelman--because they do that. They go talk. They can't touch him. 
They can't see him, but they talk to him. They can go to his grave and they did say,
son, we know you are not coming back to us. See, we can't bring him back, but we
have asked for one thing and Travis County responded. We only want justice. Do
you know what, son, we got justice. Kimberly Haley and Kris Marsh will sell no
more drugs in this community. They will not hurt anybody else. They will not bash
anyone's head in. They will not kill someone else. They will not do any other
vicious act because justice was served. So, Mike, you can rest in peace. You can
now rest in peace. Justice has been served in this case. We are now protected. Rest
in peace. 



The prosecutor in closing jury argument stressed and overemphasized the erroneously admitted
victim impact evidence relating to the extraneous murder offense, obviously to justify the State's
demand that the jury assess the most harsh and severe punishment for the charged offense of
possessing cocaine. 

 In determining the magnitude of the harm resulting from the erroneous admission of
the complained of evidence, we have examined, reviewed, and considered the whole record. We
conclude that the error in admitting the victim impact evidence relating to the extraneous offense of
murder had a substantial effect on the jury's verdict. There can be little doubt that the erroneously
admitted evidence, and the way it was used by the State, substantially affected and influenced the
jury in assessing appellant's punishment. We cannot disregard as harmless error the erroneous
admission of this evidence relating to the extraneous murder offense. Appellant's seventh point of
error is sustained. 

 The judgment of conviction is affirmed, but the judgment on punishment is reversed
and the cause is remanded to the trial court for a new trial of the punishment phase of the trial. See
Tex. Code Crim. Proc. Ann. art. 44.29(b) (West Supp. 2003).



 __________________________________________

 Carl E. F. Dally, Justice

Before Chief Justice Law, Justices Patterson and Dally*

Affirmed in Part, Reversed and

 Remanded in Part

Filed: August 14, 2003

Publish

















* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. See
Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1.   Miranda v. Arizona, 384 U.S. 436 (1966).
2.   We quote from a part of appellant's brief in argument of this point of error:


. . . I have got to ask the panel, can you all assure me that under such a
circumstance that you would be able to sign your name as a juror to the verdict
form finding the defendant not guilty, even though you think they probably are
guilty, but it is a circumstance where you don't believe the proof rose to the level 
3.   Appellant had been convicted previously of Michael Adelman's murder, but that conviction
was not a final conviction at the time of the trial of this case. 
4.   The record reflects that the prosecutor was crying during her examination of Arleen
Adelman.