Filed 4/10/15  P. v. Monsen CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071869 |
| v. | (Super. Ct. No. 62105671) |
| TYLER WILLIAM CARL MONSEN, | |
| Defendant and Appellant. | |

In this domestic violence case, defendant Tyler William Carl Monsen was convicted by jury of two counts of false imprisonment by violence or menace, one count of making a criminal threat, one count of dissuading a witness, and one count of spousal battery.  In a bifurcated proceeding, the trial court found defendant was released on his own recognizance at the time he committed one of these offenses.  The trial court suspended imposition of sentence and granted defendant five years formal probation, subject to various terms and conditions, including the condition that he serve one year in the county jail.

1

On appeal, defendant contends: (1) the prosecutor violated *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*) when he sought to impeach defendant's trial testimony with the fact defendant—after he was arrested, advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*), waived those rights, provided a statement to police, and was released from custody—did not initiate further contact with police to provide a more detailed statement; and (2) the trial court prejudicially abused its discretion by denying defendant's motion to continue the sentencing hearing after it granted his motion to access juror information for purposes of investigating potential juror misconduct and preparing a motion for new trial.

Defendant's claim of *Doyle* error is forfeited by his failure to object to the prosecutor's conduct on this ground at trial. Nor did his trial counsel provide ineffective assistance by failing to so object as the objection would have been meritless. We do, however, agree the trial court abused its discretion by denying the motion to continue the sentencing hearing. After granting defendant's motion to access juror information for purposes of investigating potential juror misconduct and preparing a new trial motion, the trial court immediately held the sentencing hearing and granted defendant probation, thereby foreclosing his ability to file the anticipated new trial motion. (See Pen. Code, § 1182 ["application for a new trial must be made and determined before . . . order granting probation"].) We therefore conditionally reverse the judgment (order granting probation) and remand the matter to the trial court with directions to allow defendant to file a motion for new trial within 20 days of issuance of the remittitur. If the motion is denied, or if none is filed, the trial court shall reinstate the order granting probation.

FACTS

Defendant routinely insulted, demeaned, threatened, and physically abused his wife, A.M., during their three-year marriage. Their daughter, C.M., who was born a few weeks after the marriage began, was often caught in the middle of the abuse. Defendant

and A.M. separated at the end of 2010. Two specific instances of violence formed the basis of defendant's convictions.

### *February Incident*

In February 2011, A.M. brought C.M. to defendant's apartment in Auburn for a visit. At defendant's request, she also picked up defendant's W-2 forms from his father's house and brought them along. After playing with his daughter for a while, defendant asked A.M. to give him a ride to H&R Block and informed her he would be claiming her and C.M. as dependents for income tax purposes. When A.M. objected, defendant became violent. He pushed her against a wall, grabbed her by the throat, and choked her against the wall. When she managed to push him away and tried to leave the apartment with C.M., he grabbed her arm and twisted it behind her back. She then yelled for him to let her leave, but he refused and continued arguing about taxes. Defendant then threw her onto his futon, causing her ribs to impact the corner of the couch. After regaining her breath lost by the impact, A.M. reached for their daughter. Defendant pulled her arm back and tried to choke her again, but stopped when C.M. started screaming. Defendant then threatened to kill both A.M. and their daughter unless he was allowed to claim them as dependents. Afraid for her life and that of her daughter, A.M. agreed and drove defendant to H&R Block.

When they returned to defendant's apartment, A.M. told defendant she wanted to leave with C.M. Defendant responded that he was not done visiting with his daughter, grabbed A.M.'s car keys from her hand, and took the keys into his bedroom. He then continued with his visit. At some point, defendant told A.M. he needed to leave. When he was gone, she found her car keys hidden between two mattresses in defendant's bedroom. A.M. then took her daughter out to the car, called her mother on the phone, and drove to the Auburn Police Department, where she reported the incident. Later that night, defendant was arrested and questioned. He was released two days later.

Based on the February incident, defendant was charged with spousal battery, false imprisonment by violence or menace, making a criminal threat, and child endangerment. The jury convicted him of spousal battery and false imprisonment by violence or menace.

*April Incident*

In April 2011, defendant called A.M. and told her to come over to his apartment to sign the tax refund check. He threatened to hurt her and C.M. if she did not do so. A.M. called a friend, Emma Lucas, who accompanied her to defendant's apartment. They also brought C.M. When they arrived, A.M. told Lucas not to call the police if defendant became violent, but to instead "just leave . . . with the baby." She then got out of the car and spoke to defendant in the parking lot outside the apartment. Defendant was angry and immediately started to argue with A.M. Not wanting to upset her daughter, A.M. walked towards the apartment, at which point, defendant grabbed her arm and pulled her inside. Lucas stayed in the car with C.M.

Inside the apartment, defendant expressed anger that he had been arrested after the February incident and told A.M. to "revoke" the statement she had given to police after that incident. She responded: "I'm not going to take it back." When A.M. started to walk out of the apartment, defendant grabbed her by the hair, held a box cutter to her neck, and told her he was going to kill her if she did not retract her statement. He also threatened to kill her if she testified against him, adding that if he went to prison, he would have "somebody else do it." Defendant further threatened to get their daughter out of the car and said: "Do you want her to be hurt?" Not wanting the situation to escalate further, A.M. offered no resistance and told defendant she trusted him when he said her life was "in his hands." Defendant then released A.M., stating he did not want to cash the refund check that day and she would have to come back later. While A.M. did not believe defendant intended to cut her with the box cutter, she left his apartment with a small cut on her neck.

4

The next day, defendant called A.M. and told her to come back to his apartment to sign the check. She complied. Two days later, A.M. returned to the Auburn Police Department and reported the April incident. She explained that she did not report the incident immediately because, after she reported the February incident, defendant was released from custody. She was afraid the police would not protect her. A.M.'s statement to police was corroborated by a two-inch cut on her neck. Defendant was arrested the same day at his apartment. A box cutter was found on the floor in the living room. Prior to being booked, defendant provided a statement in which he appeared agitated and avoided eye contact with the interviewing officer. He confirmed A.M. had gone over to his apartment and agreed to come back the next day, but denied making any threats towards her or their daughter.

Based on the April incident, defendant was charged with assault with a deadly weapon, false imprisonment by violence or menace, inflicting corporal injury on a spouse, making a criminal threat, and dissuading a witness. The jury convicted him of false imprisonment by violence or menace, making a criminal threat, and dissuading a witness.

DISCUSSION

I

***Asserted Doyle Error***

Defendant claims the prosecutor violated *Doyle*, *supra*, 426 U.S. 610 [49 L.Ed.2d 91] when he impeached defendant's trial testimony with the fact defendant did not initiate further contact with the police, after his initial *Mirandized* statement following the February incident, in order to provide a more detailed statement. This claim is forfeited by defendant's failure to object on *Doyle* grounds in the trial court. (*People v. Tate* (2010) 49 Cal.4th 635, 692.) Anticipating forfeiture, defendant asserts his trial counsel provided constitutionally deficient assistance by failing to so object. We disagree.

5

## A.

### *Additional Background*

After the February incident, Officer Ian Ackard of the Auburn Police Department contacted defendant at his apartment. Following an initial conversation, during which defendant admitted going to H&R Block with A.M., but denied assaulting her or making any threats, defendant was arrested and advised of his *Miranda* rights.[1] When asked if he understood these rights, defendant answered: "I guess, man." He then provided a statement in which he confirmed what he had already told the officer and provided additional details. Defendant was released from custody on his own recognizance two days later. At no point did defendant invoke his *Miranda* rights.

Defendant testified in his own defense at trial. During cross-examination, he claimed A.M. fabricated the February and April incidents to get him in trouble. A short time later, the prosecutor asked: "[Y]ou spoke with an officer on each -- after each of these incidents; correct?" Defendant answered: "Yeah, somewhat." The prosecutor followed up: "Did you provide all of these details to the officers at the time because you gave statements to the officers; correct?" Defendant responded: "Somewhat, yeah." The prosecutor continued: "You seem like you have a lot to say over these last --" Defendant interrupted: "Yeah. I have been waiting to talk for, like, a year and a half now. I have . . . been waiting for this day for a long time." The prosecutor challenged: "[Y]et when you had your opportunity to discuss it with the two officers, you didn't have this much information to provide to them." Defendant countered: "I was shocked at the time. I

---

[1] Defendant's conversation with Officer Ackard was recorded and played for the jury. The jury was instructed to consider the recording only as evidence of defendant's demeanor while speaking to the officer, not as evidence of the content of the conversation. Nevertheless, we provide a brief summary of the conversation to provide context for defendant's assertion of error.

6

was -- I couldn't believe this was happening to me. And, plus, the -- the officers weren't really on -- on my side or -- or even -- even believing me, for that -- for that matter."

The prosecutor then asked: "Did you ever call the police department after the first incident after you were released from jail and say, 'Hey, I want to give a statement about what happened'?" Defense counsel objected: "Improper questioning as far as representation by an attorney, things like that. That's an improper question to ask, and argumentative." The trial court asked whether defendant was represented by an attorney at the time. The prosecutor answered: "Nope." The trial court overruled the objection, explaining: "If he wasn't represented, then it's a proper question." After the prosecutor repeated the question, defendant answered: "I don't like talking to cops. I don't want anything about that."

At this point, the trial court stopped the questioning, excused the jury from the courtroom, and allowed further argument, during which defense counsel changed his objection: "If he was not represented, he was still considered an accused if he was still told to come back for court. It also improperly, I believe, shifts the burden to my client that it's his position that he must, while he's potentially facing charges, although they hadn't been filed at that point, that he must go in and prove his innocence versus it's their burden to prove their case. So he's got to go out of his way to contact the police and give them more and more statements, which then could be incriminating statements. Even though you are not charged, you still have the right to not incriminate yourself. [¶] A witness on the witness stand could take the Fifth even if they are not charged with anything. So the idea that my client should have to affirmatively go to the police and say, 'Let me tell you about what really happened,' your Fifth Amendment right doesn't just attach like in self-incrimination when you are charged with an offense."

The trial court then asked whether defendant waived his *Miranda* rights after his arrest following the February incident and provided a statement to police. Defense counsel and the prosecutor agreed he did. The trial court then asked defense counsel for

7

"authority that says that [defendant] cannot be questioned by the prosecutor on cross-examination about whether or not he [went] to the police to dispel a wrong impression." Defense counsel provided no such authority. In response to the prosecutor's argument that defendant's *Miranda* rights were not violated because the question concerned a time during which defendant was no longer in custody and no longer being interrogated, defense counsel clarified he was no longer arguing "the lack of counsel issue." He then repeated his two newly-made objections. He first argued: "[W]hat essentially the district attorney is doing with his question is unfairly shifting the burden of proof to my client; that my client must go and make an effort to disprove his guilt." Second, he argued: "It's a Fifth Amendment issue that he has the right, whether an attorney is there or not, to say, 'I don't want to speak and potentially incriminate myself in this case.' That attaches to every citizen, whether they are charged with an offense or not."

The trial court overruled the objections, explaining: "The -- the defense does bring up some interesting points, but they are more of a jury question. In other words, as far as does he have the obligation to go to the police, is that a negative fact against him, which is essentially what the People are arguing, as opposed to just sitting there? The answer is . . . that's something that the jury can consider. [¶] In other words, what I'm holding is it's not an admissibility issue. What the defense is arguing -- and you have made some good points -- is that's more of a weight issue. You can certainly argue that on cross -- I mean, closing argument." When testimony resumed, the prosecutor moved on to a different area of inquiry.

During closing argument, the prosecutor referred to defendant's statement, elicited in response to the challenged question, that defendant "didn't like to talk to the police," and argued the statement contradicted defendant's testimony that he "didn't get in trouble with the police." Defense counsel did not object to this part of closing argument.

8

## B.

### *Forfeiture*

A defendant forfeits a claim of *Doyle* error on appeal by failing to object on this specific ground at trial. (*People v. Tate*, *supra*, 49 Cal.4th at pp. 691-692.) In *Doyle*, the United States Supreme Court held "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." (*Doyle*, *supra*, 426 U.S. at p. 619.) The Court explained: "The warnings mandated by [*Miranda*], as a prophylactic means of safeguarding Fifth Amendment rights, [citation], require that a person taken into custody be advised immediately that he [or she] has the right to remain silent, that anything he [or she] says may be used against him [or her], and that he [or she] has the right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. [Citation.] Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle, supra,* at pp. 617-618.)

Here, defense counsel did not object that the prosecutor's question ["Did you ever call the police department after the first incident after you were released from jail and say, 'Hey, I want to give a statement about what happened'?"] violated defendant's right to due process under *Doyle*. Instead, he first objected to the prosecutor's question as improper based on the right to counsel and being argumentative. Abandoning that objection, counsel objected that the question unfairly shifted the burden of proof to defendant and violated his Fifth Amendment right against self-incrimination. However,

9

while the *Miranda* warnings are required in order to safeguard a defendant's Fifth Amendment rights (*Michigan v. Tucker* (1974) 417 U.S. 433, 443-444 [41 L.Ed.2d 182]), the Supreme Court did not hold in *Doyle* that impeaching a defendant with his or her post-arrest silence after receiving *Miranda* warnings violated the Fifth Amendment. Thus, objecting on Fifth Amendment grounds, without more, cannot preserve a *Doyle* claim.

Nor would defense counsel's argument have indicated to the trial court that he was actually arguing a due process violation on the basis of *Doyle*. At no point did defense counsel argue it would be unfair for the prosecutor to impeach defendant with the fact he did not contact the police to provide a subsequent statement after he was released from custody because that decision could have been based on the *Miranda* warnings he received following his arrest.

In any event, as we explain immediately below in connection with defendant's ineffective assistance of counsel claim, had defense counsel made a *Doyle* objection, it would have been properly overruled.

## C.

### *Ineffective Assistance of Counsel*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.]

10

Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

Defendant has not carried his burden. Starting with the first stage of the analysis, we note that an attorney, in order to provide reasonably competent assistance, is not required to make futile objections. (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1400; *People v. Weston* (1981) 114 Cal.App.3d 764, 780.) Here, a *Doyle* objection would have been meritless. Unlike *Doyle*, defendant did not remain silent in response to *Miranda* warnings. This case is like the situation in *People v. Collins* (2010) 49 Cal.4th 175 (*Collins*), in which our Supreme Court concluded there was no *Doyle* error and therefore no ineffective assistance of counsel for failing to object on that ground. In *Collins*, after the *Miranda* warnings, the defendant agreed to speak with the officers and never asserted his right to remain silent. The defendant gave explanations to the officers that differed from his trial testimony. (*Id*. at pp. 203-204.) Similarly here, after *Miranda* warnings, defendant spoke to Officer Ackard about A.M.'s accusations, although not with the same level of detail provided at trial. Defendant attempted to explain the greater detail by stating he had waited a long time to testify, which prompted the prosecutor to point out defendant had two prior opportunities to tell police the whole story, to which defendant responded he was "shocked" when he spoke to police and "the officers weren't really on [his] side." This prompted the challenged question regarding whether defendant offered to make another statement after he was released from custody following the February incident. In context, the prosecutor was questioning defendant regarding inconsistencies

11

between his prior statements to police and his trial testimony.  While technically, this "'may be said to involve "silence" insofar as [his prior statements] omit[] facts included in [his trial testimony,] . . . *Doyle* does not require any such formalistic understanding of "silence" . . . .'" (*Collins, supra,* at p. 204, quoting *Anderson v. Charles* (1980) 447 U.S. 404, 409 [65 L.Ed.2d 222].)

Regarding the specific question asking whether defendant attempted to fill in the detail gap following his release from custody by offering to make another statement, while we agree defendant chose "silence" over coming forward to provide another statement, *Doyle* involves silence "at the time of arrest and after receiving *Miranda* warnings." (*Doyle*, *supra*, 426 U.S. at p. 619.)  It is this "post-arrest silence" that is "insolubly ambiguous because of what the State is required to advise the person arrested." (*Id*. at p. 617.)  Here, when defendant was arrested following the February incident, he was given *Miranda* warnings, waived his right to remain silent, provided a statement to police, and was released from custody two days later.  We do not read *Doyle* to prohibit the use of post-release silence that is chosen days after waiving the right to remain silent during custodial interrogation.

Nor did the prosecutor's conduct during closing argument violate *Doyle*.  As mentioned, the prosecutor referred to defendant's response to the challenged question, i.e., that he "didn't like to talk to the police," and argued the statement contradicted defendant's testimony that he "didn't get in trouble with the police."  This argument was not "'designed to draw meaning from silence'" (*Collins*, *supra*, 49 Cal.4th at p. 204), but to impeach defendant's credibility generally by purporting to show an inconsistency in his trial testimony.  However, we also note the fact someone dislikes talking to the police does not mean the person either is or has been in trouble with the law.  Nevertheless, while there was no actual inconsistency between the two statements, the prosecutor's apparent intent in making the argument was to suggest defendant lied when he said he did

12

not get in trouble with the police. Regardless of the merit of such an argument, it did not violate *Doyle*.

Because the prosecutor's conduct did not violate *Doyle*, defense counsel's failure to object on that basis was not objectively unreasonable. For the same reason, defendant also cannot show a reasonable probability that, but for the asserted deficient performance, the result of the proceeding would have been different.

## II

### *Denial of the Request for Continuance*

We do agree the trial court abused its discretion by denying defendant's request to continue the sentencing hearing after it granted his motion to access juror information for purposes of investigating potential juror misconduct and preparing a motion for new trial.

### A.

### *Additional Background*

On June 6, 2012, the jury convicted defendant of two counts of false imprisonment by violence or menace, one count of making a criminal threat, one count of dissuading a witness, and one count of spousal battery. On June 12, 2012, the trial court found defendant was released on his own recognizance following his arrest after committing a felony during the February incident, and he remained so released when he committed another felony during the April incident. The matter was referred to the probation department, defendant waived time for sentencing, and the sentencing hearing was set for July 18, 2012.

On July 16, 2012, defendant filed a motion for a continuance in order to "conduct investigation into a statement mailed to [defense counsel] from a juror." The motion also explained defendant would be filing a motion for release of personal juror identifying information under Code of Civil Procedure section 237. The promised motion for release of juror identifying information was filed the next day. The motion was based on a letter received from one juror indicating, according to defendant, this juror "found the

13

Prosecution's case lacked credibility"; specifically, "the juror found that [A.M.] lacked credibility" and "the police officers also lacked credibility." The motion argued good cause for release of the requested information existed because the juror's letter "falls in the face of CALCRIM [No.] 224 that, essentially states that when dealing with circumstantial evidence, if one version would lead to guilty and one version would lead to not guilty, the jury must find for the version leading to not guilty. Here, the Jurors appear to have found one side of the case to be completely un-credible and unreasonable and yet chose the version of the evidence that pointed to guilt." The motion also argued, "according to the letter from the juror, it is clear that the jury did consider sentencing and punishment as part of their deliberative process"; specifically, "the juror states that they 'felt that while he would do some time in jail, he was deserving of judicial consideration of the charges we dismissed and found not guilty of and shown some leniency in sentencing.'" The argument concluded: "It is unclear, overall, as to whether they decided the case based upon considerations of meting out some perceived small punishment to [defendant] or from an actual accounting or deliberation of the presented facts in the case."

The sentencing hearing was continued to August 7, 2012. On July 31, 2012, the prosecution filed an opposition to the motion for release of personal juror identifying information. First, the opposition argued the juror's opinions regarding thought processes are inadmissible under Evidence Code section 1150.[2] Second, the opposition argued defendant's conclusion that "the jury found the Prosecution's case lacked

---

[2]    Evidence Code section 1150 provides in relevant part: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him [or her] to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).)

14

credibility . . . is a misstatement of the juror's response[s]," i.e., the "'victim' . . . lacked credibility, leading the jury to find that the major crimes (assault with a deadly weapon and child endangerment, etc.) were not believable," and "the police officers were found to lack credibility (one in particular) . . . ." Third, the opposition argued the fact that the jury found the victim and one officer in particular lacked credibility does not mean the jury ignored CALCRIM No. 224. Fourth, the opposition argued any misconduct "in considering punishment does not constitute a basis for a motion for a new trial" because it "cut in favor of the defendant rather than against him."

On August 7, 2012, the trial court entertained argument and granted the motion. The trial court explained: "At this point from the letter this Court will consider the chance of misconduct to the point that a new trial will be warranted to be very remote. [¶] On the other hand, I do agree with the defendant that given the tone of what that one juror said and the references to punishment that with proper safeguards I think that the defense should be allowed -- well, both sides for that matter should be allowed to contact the jurors. I am not going to in any way order the jurors to comply. That's up to them. But I will allow with proper safeguards both sides to contact jurors who wish to be contacted. And that's as far as I'm going to go."**3**

After granting the motion, the trial court indicated it intended to go ahead with sentencing. Defense counsel stated: "I guess I was considering that we would be getting this information and making a motion for new trial prior to sentencing." The trial court responded: "All I'm doing is releasing juror information. In fact, you yourself said earlier, but I am not going to hold you to that, that this is not a motion for a new trial. [¶]

---

**3** The trial court confirmed its ruling on August 29, 2012, after providing the jurors with notice, an opportunity to object to disclosure, and an opportunity to appear. The requested information was released, except for that relating to three jurors who objected to disclosure.

From what I have seen we're a long way [from] a motion for a new trial. There would have to be things that we don't know about that surface. And I'm not inclined, unless I get a stipulation to that effect, or unless there is legal authority requiring me to do so, to delay sentencing." Acknowledging he did not "have authority on that," defense counsel expressed concern he "would need to file a motion for new trial prior to sentencing." The trial court responded: "All I can say is unless you can show me actual legal authority that I am bound to delay sentencing or you can get a stipulation from the other side I'm going to go ahead and sentence him." The prosecutor declined to stipulate to a continuance. Defense counsel again acknowledged he did not have any authority "at [his] fingertips," but stated he "thought [granting a continuance] was essentially the common procedure." The trial court ruled: "All right. I'm going to go ahead with sentencing then."

**B.**

*Analysis*

"Under Code of Civil Procedure section 237, in a criminal case, the trial jurors' 'personal juror identifying information'—defined as their names, addresses, and telephone numbers—must be sealed after their verdict is recorded. (Code Civ. Proc., § 237, subd. (a).) However, '[a]ny person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.' (Code Civ. Proc., § 237, subd. (b); see also Code Civ. Proc., § 206, subd. (g).)

"If the trial court finds that the moving party has made a prima facie showing of good cause, and if it finds no compelling interest against disclosure, it must set the matter for hearing. (Code Civ. Proc., § 237, subd. (b).) The trial jurors are entitled to notice, an opportunity to object to disclosure, and an opportunity to appear. (Code Civ. Proc., § 237, subd. (c).)

16

"If none of the jurors object, the trial court must grant disclosure.  However, if a juror is unwilling to be contacted, the trial court must deny disclosure.  (Code Civ. Proc., § 237, subd. (d).)"  (*People v. Johnson* (2013) 222 Cal.App.4th 486, 492.)

Here, after finding a prima facie showing of good cause was made and there was no compelling interest against disclosure, the trial court granted the motion for release of juror identifying information with respect to nine jurors who did not object to disclosure of this information and denied disclosure with respect to three jurors who did object.  The Attorney General does not assert this ruling was an abuse of the trial court's discretion.  The motion was brought to investigate potential juror misconduct for the purpose of bringing a motion for new trial.  However, "application for a new trial must be made and determined before . . . the making of an order granting probation . . . ."  (Pen. Code, § 1182.)  By immediately holding the sentencing hearing and granting defendant probation, the trial court foreclosed defendant's ability to file a new trial motion, thereby defeating the purpose of granting him access to the juror identifying information.  We conclude this was an abuse of discretion.

Nevertheless, the Attorney General argues defendant "never asked for a continuance to file a motion for new trial and indeed conceded that there were no legal reasons not to go forward with sentencing."  This argument is belied by the record.  While defense counsel did not use the word "continuance," he notified the trial court he wanted to "get[] [the juror identifying] information and mak[e] a motion for new trial prior to sentencing."  The trial court understood this to be a request for a continuance, asking whether there was a stipulation or any legal authority requiring it to "delay sentencing."  After defense counsel failed to provide specific authority and the prosecutor declined to stipulate, the trial court announced it would "go ahead with sentencing then."  Immediately thereafter, the trial court asked:  "Any *other* legal [reasons], *besides what we just talked about*, why sentence should not now be imposed?"  (Italics added.)  Defense counsel answered:  "No, no legal reasons."  On this record, we conclude defense counsel

17

requested a continuance, adequately raised the issue of whether he would be foreclosed from bringing a new trial motion if the trial court went ahead with sentencing, and his answer, "no legal reasons," viewed in context, meant "no *other* legal [reasons], *besides*" what he and the trial court just talked about. (Italics added.)

The Attorney General also argues, "regardless of whether the trial court should have continued the sentencing hearing to allow [defendant] to file a motion for new trial," defendant "has failed to demonstrate reversible error" because "[t]he record shows no attempt by [defendant] to file a motion for new trial at any time." We are not persuaded. As we have already explained, defendant was required to file his new trial motion before the trial court made the order granting probation. (Pen. Code, § 1182.) After making the order granting probation, the trial court had no jurisdiction to hear a new trial motion unless defendant also filed, and the trial court granted, a petition in the nature of a writ of error *coram nobis* seeking to set aside the order granting probation. (See *People v. McGill* (1970) 6 Cal.App.3d 953, 955; see generally *People v. Wadkins* (1965) 63 Cal.2d 110, 112-113.) However, such a writ "permits the court which rendered judgment 'to reconsider it and give relief from *errors of fact*.' [Citation.]" (*People v. Soriano* (1987) 194 Cal.App.3d 1470, 1474, italics added.) "'It never issues to correct an error of law nor, so far as we have been able to ascertain, has it ever issued to redress an irregularity occurring at the trial, such as misconduct of the jury, or of the court, or of any officer of the court (except under circumstances amounting to extrinsic fraud, which in effect deprived the petitioner of a trial upon the merits).'" (*People v. Smith* (1952) 109 Cal.App.2d 76, 78-79, quoting *People v. Reid* (1924) 195 Cal. 249, 258, overruled on other grounds in *People v. Hutchinson* (1969) 71 Cal.2d 342, 347-348; accord, *People v. McElwee* (2005) 128 Cal.App.4th 1348, 1352.)

Here, there was no error of fact, but rather an error of law made by the trial court in declining to continue the sentencing hearing, thereby preventing a timely new trial motion. Thus, defense counsel could have reasonably concluded a petition in the nature

18

of a writ of error *coram nobis* would be denied, any motion for new trial filed with the petition would not be heard, and defendant's only remedy was to file an appeal to challenge the erroneous denial of the continuance motion. Indeed, the Attorney General "does not dispute that, had [defendant] attempted to file a motion for new trial, the prosecutor would likely have cited [Penal Code] section 1182, precluding hearing on the motion." And while the Court of Appeal in *People v. McGill*, *supra*, 6 Cal.App.3d 953 held a "stipulation of the parties [that] the probation order might be set aside supplied the factual posture necessary" to set aside the probation order and "waived all procedural requirements essential to such an order" (*id*. at pp. 955-956), here, defense counsel could have reasonably concluded the prosecution would not stipulate to setting aside the probation order to allow him to file a motion for new trial, particularly since the prosecution refused to stipulate to a simple continuance to allow the filing of such a motion.

Contrary to the Attorney General's argument on appeal, we cannot conclude defendant was required to file an untimely new trial motion the trial court had no basis to consider, let alone grant, in order to challenge the denial of the continuance that would have rendered such a motion timely. Nor does defendant's failure to file an untimely new trial motion "demonstrate[] that he did not have grounds upon which to file a motion for new trial." We simply do not know what, if anything, came of the release of juror identifying information. In these circumstances, we conclude the appropriate remedy is to conditionally reverse the judgment (order granting probation) and remand the matter to the trial court with directions to allow defendant to file a motion for new trial within 20 days of issuance of the remittitur. If the motion is denied, or if none is filed, the trial court shall reinstate the order granting probation.

## DISPOSITION

The judgment (order granting probation) is conditionally reversed and the matter is remanded to the trial court with directions to allow defendant to file a motion for new

trial within 20 days of issuance of the remittitur.  If the motion is denied, or if none is filed, the trial court shall reinstate the order granting probation.

                                                                      _____HOCH_____, J.

We concur:

_____BLEASE_____, Acting P. J.

_____HULL_____, J.